UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Parsons Brinckerhoff Quade
& Douglas, Inc.,

Plaintiff,

v.

MEMORANDUM OPINION
AND ORDER
Civil No. 00-1653 (MJD/JGL)

Federal Transit Administration,

Defendant.

---

David B. Potter and Bliss A. Baldwin, Oppenheimer Wolff & Donnelly LLP, and Robert Bergen, Holland & Knight LLP, for and on behalf of Plaintiff.

Lonnie F. Bryan, Assistant United States Attorney, for and on behalf of Defendant.

Andrew D. Parker and Matthew E. Johnson, Smith Parker LLP, and Mark D. Thompson, Acting General Counsel, Metropolitan Council, for and on behalf of Metropolitan Council as Amicus Curiae.

---

Plaintiff Parsons Brinckerhoff Quade & Douglas, Inc. ("Parsons") filed this action in July 2000, seeking to enjoin Defendant Federal Transit Administration ("FTA") from enforcing an ultimatum made to the Metropolitan Council ("Met Council") to terminate the Permanent Project Management contract ("PMS contract") between the Minnesota Department of Transportation ("MnDOT") and Parsons, or else the Met Council would lose federal funding for the Hiawatha Light Rail Transit Project ("Hiawatha Project"). On July 21, 2000, Judge John Tunheim granted Parsons' motion for a temporary restraining order. Now before the Court is Parsons' motion for a preliminary injunction.

AUG 18 2000
FILED
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD AUG 18 2000
DEPUTY CLERK

## INTRODUCTION

After years of debate, analysis and negotiation, the State of Minnesota made the commitment to construct a light rail transit system along the Hiawatha Avenue Corridor. To fund the Hiawatha Project, the owner and operator of the proposed light rail system, the Met Council, sought appropriations from the State of Minnesota, as well as federal funding. Total cost of the Hiawatha Project is estimated at $548,000,000.

Congress has authorized the Secretary of Transportation to make grants or loans to assist state and local agencies in financing the planning, development and improvement of mass transportation, including capital projects such as the Hiawatha Project. 49 U.S.C. § 5309(a)(1). The FTA is the federal agency responsible for the administration of these grants and loans. All grants or loans under Section 5309 shall be subject to the terms, conditions, requirements and provisions the Secretary deems necessary and appropriate. 49 U.S.C. § 5309(a)(2). Section 5309(e) provides the criteria for federal grants and loans, one of which is a full funding grant agreement ("FFGA"). The law provides that the FTA submit a formal request and a proposed FFGA to Congress for review 60 days prior to the execution of the FFGA.

The primary source of funds for the Hiawatha Project is the federal government. The Met Council has submitted an application to the FTA for $247,000,000. The Project will also receive funding from local governments. For example, Hennepin County has committed $87,000,000 in cash and in-kind contributions; the Metropolitan Airports Commission has committed up to

$70,000,000 and MnDOT has committed $17,000,000 in in-kind contributions. In addition, the State of Minnesota appropriated $40,000,000 in 1998 and $60,000,000 in 1999. These appropriations will be cancelled, however, if Congress does not approve the federal funding by January 31, 2001. 1999 Minn. Laws ch. 240, art. 1, § 9. In order to meet the deadline set by the Minnesota Legislature, a proposed FFGA must be submitted to Congress by the end of November 2000.

## FACTUAL BACKGROUND

In January 1999, MnDOT[1] awarded BRW, Inc. a preliminary engineering contract ("BRW contract") for the proposed Hiawatha Project. Parsons was engaged by BRW as a subcontractor. In August 1999, the BRW contract was amended to Parsons to provide temporary project management services, until such time as a permanent project manager could be selected through competitive bidding. Prior to executing this amendment, BRW obtained an opinion from MnDOT regarding possible conflicts of interest that could arise if BRW and Parsons were to provide such services. In a letter dated August 1 , 1999, MnDOT responded as follows:

> Lastly, it is MnDOT's opinion that if BRW and its subcontractors becomes the temporary project manager for the preliminary engineering phase of the Hiawatha LRT project, a conflict of interest will not arise with either the permanent project managements services or the design-build services. BRW and its subcontractors would not be precluded from performing project management services or becoming a part of a design-build consortium for the design-build portion of the Hiawatha LRT project.

[1] MnDOT has been designated to administer the construction of the Hiawatha Project on behalf of the Met Council.

Bergen Aff., Ex. 6.

In reliance on MnDOT's opinion, BRW and Parsons executed the Amendment to the BRW contract, which provided that Parsons would perform temporary project management services. Four days earlier, on August 16, 1999, notice of the formal solicitation for the PMS contract was issued. Parsons asserts that neither BRW nor Parsons had any involvement in preparing this solicitation.

Parsons submitted a proposal to MnDOT in response to the PMS contract RFP. A competitor, Booz-Allen & Hamilton, Inc., also submitted a proposal for the PMS contract RFP. The PMS contract was eventually awarded to Parsons. Booz-Allen protested the award to the Minnesota Department of Administration ("Department of Administration") on the basis that Parsons had a conflict of interest and had been privy to information that was not publicly available.

The Department of Administration denied the bid protest, based on its finding that MnDOT had taken the necessary steps to assure the solicitation process was fair, and that no bidder would have access to nonpublic information. The Department addressed the two specific concerns raised by Booz-Allen: the decision to procure the overall light rail project utilizing a design/build method and the decision to procure the light rail vehicles under a separate contract. As to both concerns, the Department found no merit. Bergen Aff., Ex. 10.

In September 1999, the FTA, through one of its Regional Administrators, learned of a possible conflict of interest on the part of Parsons. To address these concerns, the Regional Administrator, Joel Ettinger, contacted Richard Stehr,

Metro Division Engineer at MnDOT. Mr. Stehr responded to Mr. Ettinger's concerns in a letter dated October 1, 1999. He informed Mr. Ettinger that Parsons had not participated in the preparation of the PPM contract RFP, and that the selection process was independently monitored by the Department of Administration. Bergen Aff., Ex. 11.

Mr. Ettinger then wrote to James Solem, Regional Administrator for the Met Council, as his concerns regarding Parsons' possible conflict of interest still remained. Bergen Aff., Ex. 12. In this letter, Mr. Ettinger specifically noted the following concern:

> More specifically, the concerns focused on PB's role as interim project manager and its subsequent role in the rest of the Hiawatha Corridor project. Given that William Stead is Project Director for the Hiawatha Corridor project and Mr. Stead works for PB, FTA requests information regarding Mr. Stead's level of participation in assisting PB in its solicitation of the project management services contract. Since Mr. Stead, in his position as Project Director, has had access to the Hiawatha Corridor budget, FTA wants to know what specific steps MnDOT took to assure and guarantee itself that Mr. Stead, or any member of his PB staff, was prohibited in any way from assisting PB in its solicitation efforts for the project management services contract on the Hiawatha Corridor project.

Id.

Mr. Solem addressed Mr. Ettinger's concerns in a letter dated January 4, 2000. Bergen Aff., Ex. 13.

> The interim project management services were provided as an amendment to the BRW preliminary engineering contract. Two members of the Parsons Brinckerhoff team assigned to BRW also worked on Parsons Brinckerhoff's proposal for permanent project management. They are William Stead, the current Project Manager and Edward Ax , current Chief of Staff for the Hiawatha Project Office.

> MnDOT did not direct Parsons Brinckerhoff to exclude Mr. Stead or his staff from the preparation of a proposal for permanent project management services.
>
> MnDOT followed a standard state procurement process, as permitted by FTA rules.

Id.

On February 24, 2000, the FTA informed the Met Council by letter that it had determined a conflict of interest did exist "[b]ecause MnDOT failed to sufficiently wall off Mr. Stead's participation in both the LRT project and the PB solicitation, FTA has determined that Mr. Stead had access to information regarding the LRT project that provided an unfair competitive advantage to PB in the drafting of its proposal." Bergen Aff., Ex. 14. Because of this conflict, the FTA informed the Met Council that the FTA could not participate in the funding of the Hiawatha Project unless the Met Council provided it an acceptable resolution to the conflict. Id. The FTA further noted its concern that Mr. Stead had been involved in a prior conflict with regard to the construction contract, that resulted in a state court finding that a conflict existed and that MnDOT had acted arbitrarily and capriciously in its decision to disqualify a bidder. Id.

Correspondence continued to be exchanged between the FTA, the Met Council, and counsel for Parsons. The FTA issued its final determination on June 29, 2000. Bergen Aff., Ex. 1. In this determination, the FTA made clear the basis for its decision; that Mr. Stead had prepared the project's budget and also prepared 97 percent of Parsons' proposal to the PPM contract RFP.

> The conflict of interest stems from the dual role the PB employees played as agents of the Grantee and as PB employees, giving PB an unfair competitive advantage in the bidding process. According to the testimony from Kent Allin, Assistant Commissioner of Administration, on March 28, 2000, before the Committee, the only difference between the two bids from PB and Booz-Allen Hamilton, Inc. for the PPMS contract was the price of the bids. Mr. Allin indicated that the two proposals were equal as to qualifications and merit, and the lower price tipped the balance in favor of PB.

Id.

The FTA also determined that the amendment to the BRW contract that provided Parsons would perform temporary project management services was a "sole source award of a contract without adequate justification for a sole source award. This scenario also constitutes a violation of the full and open competition requirements in Circular 4220.1D, Section 8(a)." Id. p. 2. Because the FTA determined that the Met Council did not adequately resolve the issues surrounding Parsons and its award of the PPM contract, the FTA exercised its authority to resolve the matter and ordered that the PPM contract be re-bid. Id., p. 3. Parsons was not prevented from resubmitting a proposal. Id.

Based on the FTA's final determination, the Met Council informed Parsons that its PPM contract was terminated. Bergen Aff., Ex. 2. The Council further informed Parsons that Parsons would continue to provide such services on a temporary basis. Id.

In a letter dated July 18, 2000 to the Met Council, the FTA further clarified its decision.

> Most particularly, its preparation of the project budget necessarily provided PB with unique insight into which project line items were mandatory and which might have been considered optional. Moreover, although the total

> project cost estimate was public knowledge, PB's preparation of the project budget provided it with access to the cost estimates for each specific budget line item, information that was not available to the public.

Bergen Aff., Ex. 3.

Parsons then filed this action, claiming that the FTA's determination that the PPM contract must be re-bid is arbitrary and capricious and in violation of law.

A. Threshold Issues

1. Subject matter jurisdiction

Parsons asserts that this Court has jurisdiction over its claim pursuant to the Tucker Act, 28 U.S.C. § 1492(b)(1), which provides:

> Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

The FTA asserts that the Tucker Act only confers jurisdiction over claims involving solicitations by a Federal agency. Because the solicitation at issue in this case is by the Met Council, which is not a Federal agency, this Court does not have subject matter jurisdiction over Parsons' claims.

Parsons would have this Court interpret the Tucker Act as conferring jurisdiction over a claim involving any alleged violation of a statute or regulation in connection with any procurement or a proposed procurement, notwithstanding the fact that a state agency is the entity soliciting the proposed procurement. In support, Parsons cites to Thermalon Industries, Ltd. v. United States, 34 Fed. Cl.

411 (1995) and Ramcor Services Group, Inc. v. United States, 185 F.3d 1286 (Fed. Cir. 1999) for the proposition that the Tucker Act must be construed broadly.

First, jurisdictional statutes are to be construed narrowly. Novell, Inc. v. United States, 46 Fed. Cl. 601 (May 6, 2000)(citations omitted). Any ambiguities with regard to jurisdiction should be "resolved against the assumption of jurisdiction." Id. Second, neither Thermalon nor Ramcor supports Parsons' proposed interpretation of the Tucker Act, as both cases involved solicitations from federal agencies, not state or local agencies. Because this case does not involve a solicitation by a Federal agency, this Court finds that the Tucker Act does not confer subject matter jurisdiction over Parsons' claims. See Novell, supra (no subject matter jurisdiction pursuant to the Tucker Act where solicitation was made by the Administrative Office of the United States Courts (AOUSC), which was not a federal agency).

2. Standing

The FTA also argues that Parsons lacks standing to assert its claims under 28 U.S.C. § 1331 and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.

Article III, § 2 of the Constitution extends the "Judicial Power" of the United States to "Cases" and "Controversies." "Standing to sue is part of the common understanding of what it takes to make a justiciable case." Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 102 (1998). The "irreducible constitutional minimum of standing" has three requirements: 1) injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not

conjectural or hypothetical; 2) causation – a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and 3) redressability – a likelihood that the requested relief will redress the alleged injury. Id. at 102-103 (citations omitted). The party invoking federal jurisdiction bears the burden of establishing its existence. Id. at 104.

In addition to these requirements, courts must take into account those "prudential limitations" on standing as "founded in concern about the proper – and properly limited – role of the courts in a democratic society." Bennett v. Spear, 520 U.S. 154, 161 (1997). One such prudent limitation requires that, under the APA, a plaintiff must show that "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." National Credit Union Admin. v. First National Bank & Trust Co., 522 U.S. 479, 488 (1998). To make this determination, courts are instructed to "first discern the interests 'arguably . . . to be protected' by the statutory provisions at issue; [the court must] then inquire whether the plaintiff's interests affected by agency action in question are among them." Id., at 492.

In this case, Parsons seeks review of the FTA's decision regarding Parsons' alleged conflict of interest pursuant to the APA. Parsons argues that the relevant statute or regulation is the Federal transit program, codified at 49 U.S.C. § 5301 et. seq., and the FTA Circular 4220.1D.

It appears that Parsons has put forth sufficient evidence to meet the first two constitutional requirements of standing. The threatened cancellation of the

PMS contract constitutes imminent injury, and it is clear that the Met Council's decision to terminate said contract is traceable to the FTA.

The Court is not convinced, however, that the relief sought will necessarily provide redress for Parsons' alleged injury. The PMS contract is between Parsons and the Met Council. As the Met Council is not a party to this action, it is not bound by any determination made by this Court herein. Accordingly, there is no guarantee that the Met Council will reinstate the PMS contract with Parsons. In fact, it appears likely that the Met Council will nonetheless re-bid the PMS contract in order to ensure that the FTA will ultimately enter into a FFGA and submit the funding request to Congress.

The Court further finds Parsons cannot satisfy the additional requirement for standing under the APA. Parsons argues that the federal statutory and regulatory scheme governing federal participation in transit embraces its interests asserted in this case. Specifically, Parsons argues one of the purposes of the Federal transit program is to "establish a partnership that allows a community, with financial assistance from the Government, to satisfy its urban mass transportation requirements." 49 U.S.C. § 5301(f)(5). Moreover, the FTA Circular 4220.1D describes a system for state review, and allows a private company to bring a protest in the state system, and then if necessary, an appeal to the FTA. Parsons argues that together, the statute and Circular create a system of federal grants that gives deference to the states, with legal rights of individual review, that create a zone of interest that embraces Parsons' claims.

Parsons does not point to any cases in which a court has found that a bidder on a federally assisted mass transit project is within the zone of interest that Congress intended to protect through the Federal transit program, codified at 49 U.S.C. § 5301 et. seq. In fact, the portion of the statute that is quoted in Parsons' brief in support of its standing argument makes no mention of the competitive bidding process or any duty on the part of the FTA to give deference to state procurement processes. Reliance on the FTA Circular is also misplaced. The FTA Circular is a not a relevant statute that can provide a source for standing. See, Pullman v. Volpe, 337 F. Supp. 432 (D. Pa. 1971)(USDOT publications not relevant statutes for purposes of standing).

Although there is no case specifically on point, the existing case law does not support Parsons' argument. For example, in Pullman, the court held that the interests of a disappointed bidder with respect to a federally funded project are not within the zone of interest to be protected by the Urban Mass Transportation Act of 1964 ("UMTA"), 49 U.S.C. § 1601-1612.[2] Consistent with the decision in Pullman, the Seventh Circuit Court of Appeals held that the UMTA did not create a private right of action, and that none could be implied. City of Evanston v. Regional Transportation Authority, 825 F.2d 1121, 1123 (7th Cir. 1987) cert. denied, 484 U.S. 1005 (1988). In reaching this decision, the court noted that several courts had concluded that

> [n]either the language nor the legislative history of the UMT Act suggests that the Act was intended to create federal rights for especial benefit of a class of persons but rather was intended to benefit the public at large

[2] UMTA is an earlier version of the statute at issue in this case, 49 U.S.C. § 5301 et. seq.

> through a general regulatory scheme to be administered by the Secretary of Transportation.

Id. at 1124 (listing cases). See also, Razorback Cab of Ft. Smith, Inc. v. Flowers, 122 F.3d 657, 659 (8th Cir. 1997)(no implied right of action under UMTA). Because nothing in the Federal transit program explicitly or implicitly addresses the interests asserted by Parsons herein, Parsons has not established that it has standing to seek judicial review of the FTA's determination as to Parsons' apparent conflict of interest.

Because this Court has determined that it does not have jurisdiction over any of Parsons' claims, the request for injunctive relief must denied and this case dismissed.

B. Injunction Analysis

Even if this Court had jurisdiction over Parsons' claim, the Court would nonetheless find that injunctive relief is inappropriate. To be entitled to injunctive relief, Parsons must show (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. Dataphase Sys., Inc. v. C. L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981); accord Medtronic, Inc. v. Gibbons, 527 F. Supp. 1085, 1090 (D. Minn. 1981), aff'd, 684 F.2d 565 (8th Cir. 1982).

In this case, the balance of harm clearly weighs in favor of denying the requested injunctive relief. The FTA and the Met Council both argue that the Hiawatha Project will be in jeopardy if the injunction is granted. It is their

position that if the PMS contract is not re-bid, the FTA will not enter into the required FFGA. Without this agreement in place, federal funding is not available. Without federal funding, the Project will not proceed.

On the other hand, if the injunction is denied and the PMS contract is re-bid, there is sufficient time to meet the deadline set by the State legislature to obtain the necessary Congressional approval by January 31, 2001.

There is no dispute that termination of the Hiawatha Project will cause financial harm to various governmental entities as well as to private contractors. In addition, the State of Minnesota will lose an approximate $5 million dollars that has already spent on the Project. Because this Court is convinced that granting the requested injunctive relief will signal the end of the Hiawatha Project, the balance of harms weighs against injunctive relief.

The parties do not dispute that termination of the Hiawatha Project is also against the public interest. Because the Court finds that granting the requested injunctive relief will stop the Project, the public interest factor also weighs against granting such relief.

IT IS HEREBY ORDERED THAT Plaintiff's Motion for a Preliminary Injunction is DENIED. As this Court does not have Subject Matter Jurisdiction

over Plaintiff's claims, Plaintiffs' Complaint is hereby DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: August 17, 2000

Michael J. Davis
Michael J. Davis
United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

***June 1, 2000***

Forms/8thcircuitprehearingconf.wpd